# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WINDY LYNN CLICK, Petitioner, v. MATTHEW CATE, et al., Respondent. | 1:09-CV-1418 OWW JMD HC<br><br>FINDINGS AND RECOMMENDATIONS REGARDING PETITION FOR WRIT OF HABEAS CORPUS<br><br>OBJECTIONS DUE WITHIN THIRTY (30) DAYS |

Windy Lynn Click (hereinafter "Petitioner") is a prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a 1996 conviction for second-degree murder. The trial court sentenced Petitioner to a prison term of fifteen years to life. On February 15, 2008, the California Board of Parole Hearings ("Board") conducted a hearing and denied Petitioner parole. See Board Transcript ("Transcript") at 169.[1] The Commissioner and the Deputy Commissioner disagreed on the length of the denial (the Commissioner recommended a four-year denial and the Deputy Commissioner recommended a one-year denial). On April 15, 2008, the Petitioner's case was considered by the full Board in an *en banc* hearing. The Board issued a four-year denial of parole. See Petition at 10. On January 12, 2009, the San Joaquin County Superior Court denied Petitioner's state habeas petition.

[1] The transcript of the parole hearing is listed as Exhibit 1 of the response.

See Petitioner Exhibit 1-1. The California Court of Appeal and the California Supreme Court issued summary denials of Petitioner's claim. On August 5, 2009, Petitioner filed the instant federal petition for writ of habeas corpus challenging the Board's denial of parole. Petitioner claims the Board violated her due process rights because there was not "some evidence" in the record to show that she is currently dangerous and there was no showing of a rational nexus between the grounds stated by the Board and a conclusion of dangerousness. On November 9, 2009, Respondent filed a response to the petition. See Doc. No. 14. On December 23, 2009, Petitioner filed a traverse. See Doc. No. 19.

On August 23, 2010, this Court issued an order directing Respondent to file a complete copy of Petitioner's February 15, 2008 parole hearing transcript and a copy of Petitioner's April 15, 2008 *en banc* hearing transcript. See Doc. No. 27. On September 7, 2010, Respondent complied with the Court's order and filed a complete copy of the February 8, 2008 transcript and informed the Court that a transcript of the *en banc* hearing did not exist because a transcript was never generated. See Doc. No. 28. On September 13, 2010, Petitioner filed a request for judicial notice of Petitioner's *en banc* parole hearing transcript dated April 15, 2008 and Petitioner's errata sheet of Petitioners' initial parole hearing transcript.[2] See Doc. No. 29. On September 17, 2010, Respondent filed a response, which again indicated that a transcript did not exist for the 2008 *en banc* hearing. See Doc. No. 31.

## FACTUAL BACKGROUND

The Board summarized the facts as follows:[3]

> Robert and Windy lived together for two years before Kara (phonetic) was born. He managed an apartment complex in exchange for free rent. Kara was born four weeks early on October 13, 1994 and weighed only five pounds and one ounce. She appeared to be growing normally at her first two well baby checkups on October 20th and November 10th. By December 3rd however, Kara had been brutally abused. The emergency room doctor noticed a dark ulceration around her neck and bruises on her left foot and left hand. Investigating

[2] The Court takes judicial notice of the errata sheet of the February 15, 2008 parole hearing transcript, which is labeled as Petitioner's Exhibit A. Petitioner represents to the Court that Petitioner's Exhibit B is a complete transcript of the April 15, 2008 *en banc* hearing. However, Exhibit B is not Petitioner's *en banc* hearing transcript. Exhibit B is a transcript of the California Board of Parole Hearing Executive Board Meeting dated April 15, 2008. Accordingly, the Court will not take judicial notice of Exhibit B.

[3] The Board derived the facts from the Court of Appeals decision. See Transcript at 10.

police officers also noticed bruises on her face and blood in the corner of her eye, in addition to the bruising on her foot and hand and a rash on her neck. Coroner described at least 10 different bruises, some of different ages, 11 rib fractures, fractured clavicle and four hemorrhages inside her scalp. The injuries were due, according to the coroner, to one or multiple blows or shaking and would have required significant acceleration of the head. Both the coroner and the neuropathologist testified that there were at least two traumatic events to Kara's head. The radiologist also concluded Kara's ribs had been broken on at least two separate occasions. Based on the injuries, bruises, fractured ribs, and brain injuries, a child abuse expert opined that Kara was the victim of a battered child syndrome and that there was a very strong possibility she was the victim of shaken baby syndrome. Robert and Windy were the only percipient witnesses to the abuse. It is impossible to construct a chronology from their contradictory statements to the investigating police officers, emergency room personnel, and that trial. Instead of presenting a chronology, we tried to still from the record of the accounts they offered and the circumstantial evidence offered against them. Robert professed profound love for his daughter. He referred to her as daddy's little sweetheart and had fixed up a bedroom for her when she became a toddler. He was, however, easily frustrated with her. He hated to see her cry, and would angrily demand Windy to make the baby shut up or would shout at Kara "just shut up." Windy saw him stick his finger in her mouth and pushed her head into a pillow to stop her from crying. She saw him hold Kara up when she was crying and shake her lightly. He told Windy that when he held Kara on one occasion, her ribs crunched. He also told her he accidently elbowed Kara in the face as he jumped into this [sic] truck and Kara was sitting in her car seat. She had two bruises on her face following this incident. Robert testified that Kara's breathing was always weird. Her breathing and crying bothered him at night and once she stopped breathing for about 30 seconds. Once or twice before she died, she had vomited through her nose. He was using methamphetamine regularly, including the day he bruised her face in the truck. During the week prior to Kara's death, he was using two lines a day. The methamphetamine made him less patient, so he asked Windy to assume primary responsibility for the baby's care. He testified he never shook, hit, tossed, or squeezed Kara, shoved her head into a pillow, or purposefully tried to hurt her. During a taped interview with the investigating police officer, Windy stated, "I blame myself. I knew." Like Robert, she was using methamphetamine on December 1st or 2nd. She denied, however, she abused the baby because she was using methamphetamine or because she was irritable from lack of sleep. She could not explain the broken bones or bruises. Two nights before Kara died, she vomited through her nose and flem was suctioned in her throat. Donna Spear, S-P-E-A-R, a close friend, saw Kara almost daily from the date she was born until Thanksgiving. She testified Windy was very tired and agitated because the baby cried a lot and she was not getting much sleep. About a week before Thanksgiving, Spear offered to take Kara to the emergency room because she was very congested and had a raw sore on her neck. Windy, who was hysterical, refused. Robert's mother, Ruth Dimwiddle, D-I-M-W-I-D-D-L-E, also saw Kara nearly every day. She saw the condition on Kara's neck three weeks before her death. She noticed a bruise on her forehead and a bruise on her left check, two weeks before she died. She told Windy to take the baby to the doctor to be checked out. Windy said she was afraid the baby would be taken away. Either Robert or Windy had told her they heard a cracking sound around the baby's ribs and Robert told her that Kara had stopped breathing for about 30 seconds. Kara was very fussy the last two weeks of her life and had cried a lot on Thanksgiving. Robert, Windy, and Kara went to Ruth's house on the night of December 2nd. Kara was having trouble breathing. Robert went next door to visit friends. Windy and Kara joined him later. They did not get home until 1:30 a.m. Windy fed and changed the baby and put her in a bassinet in their bedroom. While Windy was putting Kara to bed, Robert began playing with a spyrograph and watching television. Between 2:00 and 3:00 a.m., he testified that he heard her crying, offered her a bottle, she was having a hard time breathing and looked dehydrated. She improved, according to Robert, after taking a couple of sips from her bottle. Once Windy heard Kara crying, but since she saw Robert feeding her, she did not get up. Robert put Kara in bed with him around 6:30 a.m. At approximately 9:00 a.m., Windy found Kara's lifeless

body on the bed. She screamed, called the paramedics, and Kara never regained a pulse. See Transcript at 10-16.

The Board also proceeded to read into the record, Petitioner's version of the facts as documented in Petitioner's February 2008 Board report:

> Inmate Click stated she had been on and off with her boyfriend, codefendant Robert Polzin, P-O-L-Z-I-N, for two years. She further stated that she was aware of Robert's drug usage of methamphetamine. However she felt she could make things better. She felt she could make things better by working hard and taking care of him. When they had care of victim, things started getting worse, more intense, and controlling on Robert's behalf. While she was in the hospital waiting to give birth, Robert had moved their belongings from their current residence to Stockton to Lodi. She stated he moved her and the baby from her family members. Robert was the apartment manager at the apartment they resided in Lodi and she maintained her employment at JC Trucking in Stockton. December 2nd of 1994 Inmate Click states they were at Robert's parent's house in Stockton visiting before returning to Lodi, and she and the baby slept in one room and Robert slept in another room because they bothered him by being present. On the day of the incident she states she and the baby fell asleep. She woke up and Robert was feeding the baby. She went on to say Robert told her he was taking care of the baby and to go back asleep and she did. The next morning she was awakened by the telephone ringing and she noticed the baby was not breathing. She proceeded to call 911 and 911 operator talked her through CPR. Also noted Inmate Click stated when she discovered the child was not breathing; all three of them were in bed together. The baby was sleeping between her and Robert Polzin.

See Transcript at 16-17.

The Board's Decision

The Board determined that Petitioner posed an unreasonable risk to public safety for a number of reasons, including the following: (1) the commitment offense was carried out in an especially cruel and very callous disregard for human suffering as evidenced by the victim infant's multiple bruises, contusions, hemorrhages, skin abrasions, and 11 broken ribs; (2) the Petitioner's recent serious disciplinary issues where she received multiple 115 violations; (3) Petitioner's inconsistent substance abuse treatment; and (4) Petitioner's lack of insight into the causative factors of the crime. See Transcript at 180.

## DISCUSSION

### I. Jurisdiction

A person in custody pursuant to the judgment of a State court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529

U.S. 362, 375 n.7 (2000). Petitioner asserts that she suffered violations of her rights as guaranteed by the United States Constitution. Petitioner is currently incarcerated at Valley State Prison for Women, which is located in Madera County. As Madera County falls within this judicial district, 28 U.S.C. § 84(b), the Court has jurisdiction over Petitioner's application for writ of habeas corpus. See 28 U.S.C. § 2241(d) (vesting concurrent jurisdiction over application for writ of habeas corpus to the district court where the petitioner is currently in custody or the district court in which a State court convicted and sentenced Petitioner if the State "contains two or more Federal judicial districts").

**II. Standard of Review**

On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's enactment. Lindh v. Murphy, 521 U.S. 320, 326-27 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of AEDPA and is consequently governed by its provisions. See Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Thus, the petition "may be granted only if [Petitioner] demonstrates that the state court decision denying relief was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007) (quoting 28 U.S.C. § 2254(d)(1)), overruled in part on other grounds, Hayward v. Marshall, 603 F.3d 546, 555 (9th Cir. 2010) (en banc); see Lockyer, 538 U.S. at 70-71.

Title 28 of the United States Code, section 2254 remains the exclusive vehicle for Petitioner's habeas petition as Petitioner is in the custody of the California Department of Corrections and Rehabilitation pursuant to a state court judgment. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006) overruled in part on other grounds, Hayward, 603 F.3d at 555. As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id. (quoting Williams v. Taylor, 529

U.S. 362, 412 (2000)). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Id. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the State court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner bears the burden of establishing that the state court's decision is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While *only* the Supreme Court's precedents are binding on the Arizona court, and only those precedents need be reasonably applied, we may look for guidance to circuit precedents"); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999) ("because of the 1996 AEDPA amendments, it can no longer reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent on a federal Constitutional issue....This does not mean that Ninth Circuit case law is never relevant to a habeas case after AEDPA. Our cases may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme

Court law, and also may help us determine what law is 'clearly established'"). Furthermore, the AEDPA requires that the Court give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). A federal habeas court is bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002).

The initial step in applying AEDPA's standards is to "identify the state court decision that is appropriate for our review." Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005). Where more than one State court has adjudicated Petitioner's claims, a federal habeas court analyzes the last reasoned decision. Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)) for the presumption that later unexplained orders, upholding a judgment or rejecting the same claim, rests upon the same ground as the prior order). Thus, a federal habeas court looks through ambiguous or unexplained state court decisions to the last reasoned decision to determine whether that decision was contrary to or an unreasonable application of clearly established federal law. Bailey v. Rae, 339 F.3d 1107, 1112-13 (9th Cir. 2003). If the dispositive state court order, however, does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) overruled on other grounds, Lockyer, 538 U.S. at 75-76; see also Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). Here, the San Joaquin County Superior Court reached the merits of Petitioner's claims. As both the California Court of Appeal and the California Supreme Court summarily denied Petitioner's claims, the Court looks through those decisions to the last reasoned decision; namely, that of the San Joaquin County Superior Court. See Nunnemaker, 501 U.S. at 804.

## III. Review of Petitioner's Claims

Petitioner contends her due process rights were violated by the Board's denial of parole because the denial was not based on "some evidence" of current dangerousness. Specifically, Petitioner challenges the Board's reliance on her commitment offense, contending that there is no evidence to show that Petitioner directly inflicted the injuries on her daughter and that reliance on Petitioner's offense, standing alone, does not provide "some evidence" of current dangerousness.

Petitioner additionally alleges that the Board's reliance on her 115 disciplinary infractions do not provide "some evidence" because they were non-violent infractions and remote in time. Lastly, Petitioner contends that the psychological reports do not constitute "some evidence" because the reports conclude that Petitioner was not a danger to society.

**A. Legal Standard for Denial of Parole**

The Court analyzes Petitioner's due process claims in two steps: "the first asks whether there exist[s] a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Sass, 461 F.3d at 1127. The United States Constitution does not, by itself, create a protected liberty interest in a parole date. Jago v. Van Curen, 454 U.S. 14, 17-21 (1981). The Ninth Circuit Court of Appeals has recognized that "[i]f there is any right to release on parole, or to release in the absence of some evidence of future dangerousness, it has to arise from substantive state law creating a right to release." Hayward, 603 F.3d at 555. The Ninth Circuit further recognized that "[t]here is no general federal constitutional 'some evidence' requirement for denial of parole, in the absence of state law creating an enforceable right to parole." Id. at 559. The Hayward court's finding, that there exists no free standing federal due process right to parole or the federal right to some evidence of current dangerousness, contained the consistent and continual caveat that state law may in fact give rise to federal protection for those rights. As the Ninth Circuit later reiterated, "state created rights may give rise to liberty interests that may be enforced as a matter of federal law." Pearson v. Muntz, 606 F.3d 606, 609 (9th Cir. 2010) (per curiam) (citing Wilkinson v. Austin, 545 U.S. 209, 221 (2005)). The Pearson court found that, "Hayward necessarily held that compliance with state requirement is mandated by federal law, specifically the Due Process Clause" as "[t]he principle that state law gives rise to liberty interests that may be enforced as a matter of federal law is long-established." Id.

The next question is whether California's parole scheme gives rise to a liberty interest enforced as a matter of federal law. The Ninth Circuit has definitively concluded that "California has created a parole system that independently requires the enforcement of certain procedural and substantive rights, including the right to parole absent 'some evidence' of current dangerousness."

Id. at 611 (citing Hayward, 603 F.3d at 562); see also Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010) (noting that "California's 'some evidence' requirement is a component of the liberty interest created by the parole system of that state"). Consequently, the inquiry that a federal habeas court must undertake in determining whether the denial of parole comports with the requirement of federal due process is "whether the California judicial decision approving the governor's [or parole board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" Hayward, 603 F.3d at 563 (quoting 28 U.S.C. § 2254(d)(1)-(2)) (footnotes omitted). Thus, the inquiry the Court must now undertake is whether the San Joaquin County Superior Court's decision was an unreasonable application of California's "some evidence" standard.

**B. Superior Court Decision**

The San Joaquin County Superior Court concluded that there was "some evidence" in the record to support the Board's finding that Petitioner was unsuitable for parole. See Petitioner's Exhibit 1-1 at 3. The Superior Court found that the facts of the commitment offense indicated that Petitioner posed an unreasonable risk of danger to society. However, the Superior Court noted additional circumstances that the Board considered, including Petitioner's inconsistent substance abuse treatment. The Superior Court further observed that:

> Although the psychological evaluation determined that Petitioner posed a "very low risk" for future violence, the report also noted, "She has shown no acts of violence while in prison. On the other hand, if the inmate should turn to a (sic) using drugs and/or alcohol or become involved with individuals using drugs and alcohol her risk[s] of re-offending increase." (Psychological Report, dated February 8, 2008, page 8, Exhibit "K" to Petitioner's Petition.)

See Petitioner's Exh. 1-1 at 2.

In addition, the Superior Court noted that:

> In sum, the Board or the Governor may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmates' criminal history, but some evidence will support such reliance *only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety. (Regs., §2281, subd. (a).) Accordingly, the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor. *In re Lawrence* (2008) 44 Cal.4th 1181, 1221, 190 P.3d 535.

The Superior Court applied the correct standard of review. The California Supreme Court

held in In re Lawrence that, "[t]he relevant determination for the Board and the Governor is, and always has been, an individualized assessment of the continuing danger and risk to public safety posed by the inmate." In re Lawrence, 44 Cal. 4th 1181, 1227 (2008) (noting that "mere recitation of the circumstances of the commitment offense, absent articulation of a rational nexus between those facts and current dangerousness, fails to provide the required "modicum of evidence" of unsuitability"). "[A] reviewing court must consider 'whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor.'" Cooke, 606 F.3d at 1214 (emphasis in original) (quoting Lawrence, 44 Cal. 4th at 1221). As the Ninth Circuit observed in Cooke:

> Under California law, "the paramount consideration for both the Board and the Governor" must be "whether the inmate currently poses a threat to public safety and thus may not be released on parole, "[citation], and "the facts relied upon by the Board or the Governor [must] support the ultimate decision that the inmate remains a threat to public safety.

Id. (quoting Lawrence, 44 Cal. 4th at 1210, 1213); see also Cal. Code Regs. tit. 15, § 2402(a) ("[I]f in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison," the prisoner must be found unsuitable and denied parole). Here, the Superior Court considered whether there was "some evidence" of current dangerousness. The Court's review of the record reveals that the evidence cited by the Superior Court is sufficient to satisfy the "some evidence" standard.

**C. Commitment Offense**

Petitioner challenges the Board's reliance on her commitment offense as a factor probative of current dangerousness. The Superior Court noted that the commitment offense was "carried out in an especially cruel and very callous manner" as evidenced by the victim's extensive injuries. The Superior Court's finding that Petitioner carried out the crime in an especially cruel and very callous manner is not supported by any evidence in the record that Petitioner personally inflicted injuries on the victim. With respect to Petitioner's role in the life offense, the Board asked the Petitioner the following questions:

> Q: So in essence you basically are looking at, and certainly that's documented in the Appellate decision, that Robert inflicted these injuries on this child, is that correct?
> A: Yes sir.
> Q: And that you never placed any or you never abused this child?

U.S. District Court
E. D. California

A: No sir.

See Transcript at 34-35. Nonetheless, as the Superior Court noted, the Board relied on additional evidence to support its decision that Petitioner posed a current unreasonable risk of danger to the public as described below.

**D. Inconsistent Substance Abuse Treatment**

The Board found that Petitioner's inconsistent substance abuse treatment weighed against finding Petitioner suitable for parole.[4] Specifically, the Board stated:

> Again noting that in your discussion here today that the only thing as to how you were addressing your substance abuse was through work and through church, and I feel that you need to do something a little more consistent – to be a little more consistent in that and actually try to get something that you can present to us today, or next time, that you are going to some form of classes and attendance in substance abuse and continue to work your 12 steps.

See Transcript at 174. There is "some evidence" in the record to support the Board's finding of current dangerousness with respect to Petitioner's inconsistent substance abuse treatment in light of the following: (1) At the parole hearing, Petitioner testified that she had a history of methamphetamine and marijuana dependance, used methamphetamine two or three times a week, and was using methamphetamine on the day of the offense (see Transcript at 58, 108); (2) When the Board asked Petitioner what impact she believed that her drug use had on the care of her baby, Petitioner responded: "Well I believe it had a lot of impact..." (see Transcript at 59); (3) Petitioner informed the Board that her participation in substance abuse treatment was "sporadic" (see Transcript at 174); and (4) the Board noted that Petitioner's 2008 psychological report also stated that "Should the inmate return to a similar environment her chanced [sic] of re-offending are high." See Transcript at 108-109; Respondent's Exhibit 14-2 at 8-psychological report, dated February 8, 2008. Further, as the Superior Court noted, although Petitioner's psychological evaluation determined that Petitioner posed a "very low risk" for future violence, the report also noted that if the inmate returned to using drugs or became involved with individuals using drugs her risk of re-offending would increase. See Petitioner's Exhibit 1-1 at 2; see also Transcript at 108; Respondent's Exhibit 14-2 at 8-psychological report, dated February 8, 2008.

---

[4] Petitioner did not address the Board's reliance on Petitioner's inconsistent substance abuse treatment.

Accordingly, the Superior Court's finding that Petitioner's inconsistent substance abuse treatment is probative of Petitioner's current dangerousness is supported by "some evidence," and there is a rational nexus between the evidence cited by the Board and Petitioner's risk of danger if released in light of the role drugs played in Petitioner's commitment offense.

**E. Disciplinary History**

Petitioner challenges the Board's reliance on Petitioner's disciplinary history.[5] The Board noted that Petitioner had four serious disciplinary violations. The Board focused on Petitioner's most recent violation, which occurred on January 15, 2003, where Petitioner allowed another inmate to borrow her computer password.[6] During the parole hearing, the Board asked Petitioner: "Okay. Knowing that you could get in trouble, tell me a little bit about what your thinking was on allowing another inmate to get on your computer and use it illegally?" See Transcript at 92-93. Petitioner responded: "I just felt like I had to fit in, but now I see that I don't need to fit in...." See Transcript at 93. The Board reasoned that although the January 15, 2003 infraction was non-violent, it nonetheless demonstrated "some lack of ability [for Petitioner] to stand up for herself and not allow things that Petitioner knows are wrong to go around her, which is what got Petitioner in prison in the first place." See Transcript at 179.

California Parole regulations list institutional behavior as one of the factors the Board considers in determining whether the prisoner poses a current risk of danger to the public safety. See Cal. Code Regs. tit. 15, § 2402(c)(6). Institutional behavior, defined as "[t]he prisoner has engaged in serious misconduct in prison or jail," is a circumstance tending to show parole unsuitability. Here, the Board's reliance on Petitioner's serious disciplinary history amounts to "some evidence" of current dangerousness in light of the following: (1) Petitioner's January 15, 2003 serious disciplinary violation occurred within the last five years of the Petitioner's Board hearing; and (2) as explained by the Board, the violation indicated some lack of ability by Petitioner to stand up for herself and not allow harmful things to occur around her. See Transcript at 179. Petitioner explained that she

[5] The Superior Court did not address Petitioner's serious disciplinary history.

[6] Petitioner testified that at the time of the January15, 2003 disciplinary violation, she was employed as a special skills clerk and as a result had permission to use the computers. Petitioner allowed another inmate to use Petitioner's password to log onto the computers. See Transcript at 92.

allowed another inmate to break the rules because she wanted to "fit in." See Transcript at 93. Petitioner's relatively recent desire to "fit in" is probative of current dangerousness given that her role in the commitment offense was based on her inaction and inability to stand up for herself in a situation where harmful things were happening to her daughter at the hands of her codefendant.

**CONCLUSION**

The Board relied on several factors in determining that Petitioner was unsuitable for parole, including Petitioner's commitment offense, inconsistent drug abuse treatment, recent serious disciplinary history, and lack of insight.[7] The Court cannot find that the Superior Court's determination that the Board's decision is supported by "some evidence" was objectively unreasonable. Therefore, Petitioner is not entitled to habeas corpus relief.

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides that a circuit judge or judge may issue a certificate of appealability where "the applicant has made a substantial showing of the denial of a constitutional right." Where the court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 326; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338. In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable; thus Petitioner's claim is not deserving of encouragement to proceed further. Consequently, the Court hereby recommends that Petitioner be DENIED a certificate of appealability.

---

[7] The Court notes that the Board also relied on Petitioner's alleged lack of insight with respect to Petitioner's commitment offense. See Transcript at 177-178. The Court does not express an opinion on this factor as it was not necessary for the Court to reach its decision. The Court notes that Petitioner did not address the Board's reliance on Petitioner's alleged lack of insight.

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that:

(1) The petition for writ of habeas corpus be DENIED WITH PREJUDICE; and

(2) the Clerk of Court be DIRECTED to enter judgment for Respondent; and

(3) A Certificate of Appealability be DENIED.

This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) *court* days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(c). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated: November 8, 2010** **/s/ John M. Dixon**
UNITED STATES MAGISTRATE JUDGE